NOTICE
Decision filed 12/19/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240185-U

NO. 5-24-0185

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 23-CF-56 |
| | ) | |
| RANDAL C. EVERITT, | ) | Honorable |
| | ) | James W. Campanella, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We reverse and remand for a new trial where defendant did not knowingly and voluntarily waive his right to a jury trial.

¶ 2     Defendant, Randal C. Everitt, appeals his conviction and sentence following a stipulated bench trial before the circuit court of Perry County. The court found defendant guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)), a Class 3 felony, and sentenced him to six years in prison. Defendant appeals, arguing the UPWF statute is unconstitutional both facially and as applied to him under the second amendment (U.S. Const., amend. II) and the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Defendant further argues the trial court denied his constitutional right

1

to a jury trial when the "trial judge improperly pressured him into an involuntary jury waiver and stipulated bench trial." For the following reasons, we reverse and remand.

¶ 3                                  I. Background

¶ 4      We recite only those facts relevant to the dispositive issue on appeal. On May 4, 2023, the State charged defendant by amended information with two counts of aggravated assault (720 ILCS 5/12-2(b)(4.1)(i) (West 2022); *id.* § 12-2(c)(6)(i)), two counts of UPWF (*id.* § 24-1.1(a)), and one count of possession of a firearm without requisite firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2022)). On May 8, 2023, a grand jury returned a bill of indictment charging defendant with the same.

¶ 5      The charges stemmed from a May 3, 2023, incident involving defendant and officers from the DuQuoin, Illinois, police department. That afternoon, officers conducted a wellness check after an individual, later identified as defendant, called a Veterans Affairs hotline and expressed suicidal ideations and that "he wanted to die by a cop." After two officers located defendant, one observed defendant in a third-story window move a curtain aside and point a rifle with a bipod out the window. The officer heard defendant yelling and believed the firearm was pointed in his direction. The officers retreated to take cover, prompting defendant to close the curtain. Police learned that defendant did not possess a valid FOID card and had prior federal felony convictions. Police requested, and subsequently executed, search and arrest warrants six hours after the initial encounter. Police arrested defendant and seized, among other items, a loaded Ruger AR .556 rifle with a bipod.

¶ 6      On July 11, 2023, the trial court held a bond hearing. The court informed defendant that his offense was "more heinous than most" because defendant pointed the firearm at police officers, stating: "had I been the police officer involved, I would have had my life flashing in front of me

2

looking down the barrel of that gun." The court further stated that "[b]y [defendant's] own admission, he is a borderline psychopath." The court denied defendant's motion for bond reduction, informing defendant that "the weight of the evidence is thoroughly against him."

¶ 7 At the next pretrial hearing on October 11, 2023, defendant asserted his innocence and desire for a jury trial, stating: "I know I am innocent of the assault against [the police officer]. I know I didn't do it. And I feel *** I have a better chance with a jury than I do with [a] bench [trial]." The trial court responded that it was attempting to determine whether defendant was "fully aware of the charges and capable of assisting in [his] own defense" because "[his] defense apparently stands in the face of overwhelming evidence to the contrary, shall we say." The court asked defendant what he expected of his attorney "in the way of a vigorous defense if you have nothing to offer him in the way of a vigorous defense." Defendant indicated his interest in pursuing jury nullification in his defense but then added that "[he] ha[d]n't been able to assist in [his] defense. The whole thing kicked off because of a new medication [he] started taking." Defendant asserted that he never threatened anybody, but that the Veterans Affairs crisis line "mandatorily reported [defendant's comments] to the police department and then the Duquoin Police swatted [defendant]." The court asked defendant if he had ever been prescribed psychotropic medication. Defendant answered in the negative, stating he had "plenty" of mental health evaluations and had been in therapy for about 22 years. The court inquired if defendant felt he would benefit from a fitness evaluation by a clinical psychologist. Defendant declined.

¶ 8 On October 16, 2023, the trial court held another pretrial hearing. The court stated that defendant "expect[ed] his attorney, if I recall correctly, to present a vigorous defense but at the same time had no idea how he would suggest his attorney to do that." The court then addressed defendant stating the following: "I am still a little bit concerned about your mental approach to

3

this thing. Can you help me out any better than you did last time?" Defendant replied that he reviewed the evidence and reasserted his desire for a jury trial, stating: "I just prefer the offer with the jury trial. It is my option to have one and I would like to." The court asked if defendant fully understood the case and could assist in his defense because "[y]our defense is going to be that you didn't do what you are accused of doing." The court, again, asked if defendant wanted to submit to a fitness evaluation after defendant "start[ed] to scare [the court]" when defendant seemingly forgot signing a continuance. The court stated that it believed defendant had "no concept of what's going to happen at trial if you are going to take a position that you didn't do anything that they said you have done here." The court said it would "reluctantly" set the case for trial and addressed defense counsel:

> "I don't think this man is being the least bit realistic. I think he is in his own little fog and he expects that you listen to him instead of he listen to you about what the law is.
> So I don't envy your position. We will set it for a trial and I will show it as announced ready. And unless you can come up with better evidence as to his unfitness, I don't know what else we can do."

¶ 9 Following the hearing, defense counsel filed a motion for fitness evaluation. The November 6, 2023, fitness evaluation report indicated that defendant had normal intelligence, had unimpaired short- and long-term memory, and graduated high school and attended some college. The evaluation noted that defendant "feels that he knows better than anyone else and projects his failings onto others" but that his mental illness did not "substantially impair" his ability to understand the proceedings. In his fitness evaluation, defendant insisted on a jury trial and felt he could get a jury to agree with his "jury nullification" defense.

¶ 10 At a November 8, 2023, hearing, the court addressed the fitness evaluation report, finding that defendant "understands the charges, he is capable of assisting in his own defense, albeit his defense probably sucks. Now that's basically what [the report] said." Defense counsel told the

court he would give defendant copies of jury instructions to help him better understand the proceedings. The court replied that that was a "very good idea" because

> "[W]hen [defendant] insert[s] this concept of jury nullification it makes me nervous because it makes me believe that you are going to somehow count on a concept to where those jurors will absolutely deny their oath, deny what I give them in the way to rules, and reach some off the wall verdict that's not supported by the evidence. That can't and won't happen in this courtroom."

The parties stipulated to the fitness report, and the court found defendant fit to stand trial.

¶ 11 On January 18, 2024, defense counsel filed a motion to suppress, arguing there was no probable cause for the issuance of the search warrant. At a January 19, 2024, pretrial hearing, the court acknowledged the motion and informed the parties that the motion would be taken up at the next hearing. The court and defense counsel subsequently recognized defendant's continued insistence on a jury trial. Defendant stated that, though he was not "hung up" on a jury trial, he felt he would receive a "fairer adjudication" in a jury trial. The court requested defendant inform the court as soon as possible if he changed his mind "in any way, shape or form about this jury."

¶ 12 At the outset of the pretrial hearing on January 22, 2024, the trial court expressed concern for defendant after defense counsel informed the court that defendant felt unwell. Defendant claimed he felt dizzy and had difficulty breathing. Despite this, defendant indicated that he did not want to delay the case. The court then heard defendant's motion to suppress and, following arguments by the parties, denied the motion. After discussing the matter with his attorney during a recess, defendant agreed to waive his right to a jury trial. The court stated that defendant had eaten and "addressed his low sugar problem." When asked if he felt better defendant said, "It's just something weird that's come up this weekend, your Honor. I don't know what it is. It's new." In response to the court's questioning, defendant said he was thinking clearly, not under the influence of alcohol or drugs, not taking drugs that affected his mood level, and did not feel

5

pressured or promised into his decision. The court inquired, "Okay. Other than what you and [defense counsel] have been debating here for the last couple, three hours now, anyone made any threats or promises to you ***?" Defendant replied in the negative. The court and defendant discussed the difference between a jury trial and a stipulated bench trial. The court explained that defendant would be tried on one count of UPWF—with the State not pursuing the other charges— and, if found guilty, the State would argue for a sentence of no more than eight years. After defendant signed the written waiver, the court found that defendant knowingly, voluntarily, and intelligently in open court waived his right to a jury.

¶ 13    Three days later, on January 25, 2024, defense counsel filed a motion to dismiss for delay in defendant's right to a speedy trial and a "Motion to Dismiss and Declare Statute Unconstitutional," arguing the UPWF statute was unconstitutional both facially and as applied to defendant. That same day, the trial court conducted a hearing on the motions. The court asked defendant how he was feeling. Defendant replied, "I feel better than I did on Tuesday when we talked." The court, again, explained what would take place during defendant's stipulated bench trial. Defendant then said, "I never heard the word stipulated bench trial prior to last Monday." He said his attorney did a good job explaining it and told the court it had been "very candid back in our off the record meeting." Defendant began to complain about body camera evidence and that he would "rather see [the officer] try to explain that to a jury" and a "jury would be more critical of the fact that he just decided not to wear a body cam and ignore the statute." Defendant concluded, "Anyway, I do feel I understand what you are saying and I do want to retract my stipulated bench trial waiver. I am going to retract my waiver to a jury trial. *** I want my reputation restored."

¶ 14    The following exchange between the trial court and defendant occurred:

6

"THE COURT: Well, let's just address this issue of what you said there, which is very surprising to me. Now you have changed your mind from what you did on Monday to the point where you now are asking me to reconsider now your motion for a stipulated facts bench trial here and you want to go to a jury trial. Is that what you are telling me?

DEFENDANT EVERITT: Well, the meeting with you Tuesday kind of clinched it when, you know, court happened and the attorneys were dismissed and—

THE COURT: The meeting was Monday, by the way.

DEFENDANT EVERITT: I am not real sure.

THE COURT: It wasn't Tuesday. Go ahead.

MR. FOSTER [(Defense Counsel)]: Are you feeling okay?

DEFENDANT EVERITT: Not particularly, but I feel much better than I did. I can actually breathe but—

THE COURT: It's the same thing I asked him on Monday if he was feeling okay and he told me he was.

DEFENDANT EVERITT: I did.

THE COURT: And then we decided that he was going to waive a jury, which he did, and I found that he knowingly, intelligently and in open court waived that jury. So I have got to be honest, I find absolutely no reason whatsoever to go back now and let him change his mind after we have gone to the time and expense of calling in jurors, releasing those jurors. *** So I will respectfully decline his oral motion ***."

The parties then argued the motion to dismiss based upon speedy trial, which the trial court denied.

The parties next argued the "Motion to Dismiss and Declare Statute Unconstitutional," which the court also denied.

¶ 15    On January 29, 2024, the parties proceeded to a stipulated bench trial. The parties stipulated that on May 3, 2023, officers responded to defendant's residence to conduct a welfare check. Officers learned that defendant had prior felony convictions and executed a search warrant, at which point, they seized a firearm and arrested defendant. After brief arguments, the court found defendant guilty of UPWF and sentenced him to six years in prison. Defendant timely appealed.

¶ 16                                    II. Analysis

¶ 17    On appeal, defendant first contends the UPWF statute is unconstitutional both facially and as applied to him under the second amendment (U.S. Const., amend. II) and the United States

7

Supreme Court's decision in *Bruen*, 597 U.S. 1 (2022). Second, defendant argues the trial court denied his constitutional right to a jury trial when the "trial judge improperly pressured him into an involuntary jury waiver and stipulated bench trial." Because we reverse on the latter issue, we need not consider defendant's constitutional arguments.

¶ 18 Defendant contends that he "adamantly maintained his innocence and repeatedly expressed his desire for a jury trial," but that the trial court treated defendant as though he was mentally unfit, already guilty of the offenses, and had no viable defense. Defendant argues it was only after these "repeated judicial comments" that defendant briefly waived his right to a jury trial before immediately changing his mind. The State rebuts that the record does not support defendant's contention that he was pressured and "[n]othing the trial court said improperly influenced" defendant. We agree with defendant.

¶ 19 The right to a jury trial in criminal prosecutions is guaranteed by the United States Constitution and Illinois Constitution. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "Every person accused of an offense shall have the right to trial by jury unless (i) understandingly waived by defendant in open court ***." 725 ILCS 5/103-6 (West 2022). A defendant may waive his right to a jury trial, but the trial court must ensure the waiver was understanding and knowing. *People v. Hutt*, 2023 IL 128170, ¶ 30 (citing *People v. Bracey*, 213 Ill. 2d 265, 269 (2004)). "Whether a waiver is knowing and understanding depends on the particular facts and circumstances of each case." *Id.* No exact admonition or set of advice is required from the trial court before an effective waiver may be made. *People v. Tooles*, 177 Ill. 2d 462, 469-70 (1997). A written jury waiver is one means by which a defendant may waive his right to a jury trial, but the written waiver is neither automatically valid nor dispositive that a waiver was made knowingly and understandingly. *Bracey*, 213 Ill. 2d at 269-70. Any doubt about a waiver of constitutional

8

right must be resolved in favor of the accused. *People v. Rambo*, 123 Ill. App. 2d 299, 305 (1970). "[C]ourts must indulge every reasonable presumption against the waiver of fundamental constitutional rights." *Id.* (citing *Johnson v. Zerbst*, 304 U.S. 458, 463 (1938)). Whether a defendant knowingly and understandingly waived his right to a jury trial is a question of law we review *de novo*. *Bracey*, 213 Ill. 2d at 270; *Hutt*, 2023 IL 128170, ¶ 30.

¶ 20    Based upon our thorough review of the record, we cannot conclude that defendant knowingly, intelligently, and voluntarily waived his right to a jury trial. The record reflects that defendant consistently expressed his desire to proceed via jury trial but faced pushback and commentary from the trial court each time. First, the trial court repeatedly questioned defendant's mental fitness during pretrial hearings. At a July 11, 2023, bond hearing, the court, quoting defendant's words from a pretrial investigation report, noted, "[b]y [defendant's] own admission, he is a borderline psychopath." Then, at the October 11, 2023, pretrial hearing, defendant asserted his innocence and felt he would "have a better chance with a jury than [he would] with bench." The court responded by asking if defendant was ever prescribed psychotropic drugs and if he wanted to be evaluated for his fitness to stand trial by a clinical psychologist. At the October 16, 2023, pretrial hearing, the court questioned defendant's "mental approach" to a possible jury trial and defendant responded, "I just prefer the offer with the jury trial. It is my option to have one and I would like to." The court stated that defendant would have "no concept" of what would happen at trial if defendant pursued his desired defense strategy. The court told defense counsel that it would move forward to a jury trial unless defense counsel could "come up with better evidence as to his unfitness." Defendant did undergo a fitness evaluation and was found fit to stand trial. While it is vital that trial courts ensure the mental competency of defendants before them, (*People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 50), here, the court's questioning of defendant's mental

9

health and fitness came often in direct reply to defendant's assertions of innocence and desire for a jury trial. At a minimum, these comments raise doubts as to the voluntariness of defendant's jury trial waiver.

¶ 21 The trial court additionally commented on the strength of the case against defendant. The court noted at the July 11, 2023, bond hearing that defendant's offense was "more heinous than most" and that "the weight of the evidence is thoroughly against [defendant]." At the October 11, 2023, pretrial hearing, the court told defendant that his "defense apparently stands in the face of overwhelming evidence to the contrary," and that defendant had "nothing to offer [defense counsel] in the way of a vigorous defense." At the October 16, 2023, pretrial hearing, the court, again, stated that it had "no idea" how defendant could offer a viable defense. Defendant argues on appeal that these comments are tantamount to the court's prejudgment of the case. *People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995) ("The judge must refrain from interjecting opinions, comments, or insinuations reflecting bias toward or against any party."). While we decline to label these comments "prejudgment" of defendant's case, we do find that the comments influenced defendant's decision to waive his right to a jury trial. Again, at a minimum, the court's commentary on the strength of the case against defendant raises doubts concerning defendant's jury trial waiver.

¶ 22 The trial court also continuously commented on defendant's intended trial strategy throughout pretrial proceedings. As detailed above, when defendant explained that he would pursue jury nullification as a defense strategy, the court questioned defendant's fitness and brought up the strength of the State's case. Further, at a November 8, 2023, pretrial hearing, the court summarized the fitness evaluation report saying defendant "understands the charges, he is capable of assisting in his own defense, albeit his defense probably sucks. Now that's basically what [the

10

report] said." The court continued commenting on the jury nullification strategy stating the following:

> "[Y]ou are going to somehow count on a concept to where those jurors will absolutely deny their oath, deny what I give them in the way to rules, and reach some off the wall verdict that's not supported by the evidence. That can't and won't happen in this courtroom."

¶ 23    While a defendant is not entitled to argue or instruct a jury on nullification (*People v. Moore*, 171 Ill. 2d 74, 110 (1996)), "[j]ury nullification is always a possibility." *People v. Ganus*, 148 Ill. 2d 466, 473 (1992). "[C]ounsel may not argue that jurors should ignore the law in coming to a decision, he may [however] present a defense evoking the 'empathy, compassion or understanding and sympathy' of the jurors." *People v. Gilbert*, 2013 IL App (1st) 103055, ¶ 28 (quoting *Ganus*, 148 Ill. 2d at 473-74). Here, defendant repeatedly asserted his desire for a jury trial and specifically detailed that he would pursue jury nullification as the strategy. While the trial court was correct that defendant could not directly argue or instruct the jury on nullification, the totality of its comments seemingly foreclosed even the possibility of this strategy for defendant.

¶ 24    In sum, the trial court's comments throughout the pretrial proceedings bring into doubt the voluntariness of defendant's jury trial waiver. At every point that defendant expressed his desire for a jury trial, explained his strategy, or asserted his innocence, the court responded by inquiring into defendant's mental health, commenting on the strength of the State's case, or criticizing defendant's trial strategy. The totality of the court's comments in the record leads this court to doubt the voluntariness of defendant's waiver, and any doubt about a waiver of constitutional right must be resolved in favor of the accused. *Rambo*, 123 Ill. App. 2d at 305.

¶ 25    Defendant's state of mind immediately before, during, and after the waiver is also questionable. After defendant consistently avowed his wish to proceed via jury trial, he briefly waived his jury trial right on January 22, 2024, and then attempted to withdraw his waiver three

11

days later. At the outset of the January 22, 2024, hearing, defendant expressed that he felt dizzy and was having trouble breathing but told the trial court he did not want to delay the case any longer. Following a recess and a lengthy discussion between defendant and defense counsel, the court noted that defendant ate food and the court then asked defendant if he was feeling better. Defendant responded, "It's just something weird that's come up this weekend, your Honor. I don't know what it is. It's new." After answering the court's admonishments and questions, defendant signed the written jury trial waiver, which the court accepted. That same day, an off-the-record meeting between defendant, defense counsel, and the court occurred, where they further discussed the stipulated bench trial. Three days later, defendant did not remember which day the meeting had occurred, prompting the court and defense counsel to ask if defendant was feeling okay. Defendant replied, "Not particularly, but I feel much better than I did." Regarding the off-the-record meeting, defendant stated, "I never heard the word stipulated bench trial prior to last Monday[,]" but that his attorney did a good job explaining it and told the court it had been "very candid back in our off the record meeting." Defendant stated that this meeting "kind of clinched" his decision to withdraw his waiver and pursue a jury trial as he originally intended. He asked to withdraw his waiver of a jury trial, which the court denied.

¶ 26    We find that these circumstances surrounding the waiver raise doubts as to whether defendant knowingly and intelligently waived his right to a jury trial. Although defendant signed the written waiver and answered the trial court's questions and admonishments in such a way as to lead the court to accept the waiver, defendant experienced dizziness and difficulty breathing at the hearing. Three days later, defendant appeared confused about when the last hearing was and still expressed that he did not feel well. Immediately following his waiver, the off-the-record meeting further explaining a stipulated bench trial "kind of clinched" his wish to proceed via a

12

jury trial. Defendant then requested to withdraw his waiver at the very next court hearing. Although we lack the details of the off-the-record meeting, our review of this record indicates that defendant lacked clarity and understanding of the jury trial waiver. As such, we cannot conclude defendant waived his right knowingly and intelligently.

¶ 27    The State contends that the record "unequivocally shows defendant waived his jury-trial right knowingly, intelligently, and voluntarily." The State submitted *People v. Tooles*, 177 Ill. 2d 462 (1997) in support of its argument. In that case, our supreme court considered three consolidated cases to determine "whether a judgment of conviction must be reversed and the cause remanded for a new trial where a trial court fails to secure a defendant's written jury waiver." *Id.* at 464. The *Tooles* court found that all three jury trial waivers were understandingly made, given the trial courts admonished the defendants and the defendants expressed their understanding in response. *Id.* at 473. The State argues that the trial court in the present case "provided even more questioning of and information to defendant than any of the trial courts did in *Tooles*." We find *Tooles* distinguishable. The court in the present case, like in *Tooles*, did admonish defendant regarding his waiver. However, unlike the courts in *Tooles*, the circumstances, here, involve improper comments from the court in the hearings leading up to the waiver and admonishments, whereas no such circumstances existed in the *Tooles* cases. Here, the State acknowledged at oral argument before this court that the trial court's comments were inappropriate but maintained its position that the comments did not improperly influence defendant. We disagree and find the court's comments raise doubts concerning defendant's waiver.

¶ 28    In sum, we conclude that the trial court's comments at the pretrial hearings regarding defendant's fitness, jury strategy, and the State's evidence against defendant give rise to doubts concerning the voluntariness of defendant's jury trial waiver. Defendant's immediate attempt to

withdraw his waiver as well as his ill-being, confusion, and questionable state of mind before, during, and after the waiver raise doubts as to whether he knowingly and intelligently waived jury trial. The unique facts and circumstances of this case lead to doubts concerning the voluntary, knowing, and intelligent nature of defendant's jury trial waiver. Because we "indulge every reasonable presumption against the waiver of fundamental constitutional rights" (*Zerbst*, 304 U.S. at 463), and resolve any doubt about a waiver of constitutional right[s] in favor of the accused (*Rambo*, 123 Ill. App. 2d at 305), we reverse.

¶ 29 Due to the circuit court's repeated comments at the pretrial hearings regarding defendant's fitness, jury strategy, and the State's evidence against defendant, we conclude that this case should be reassigned to a new judge on remand to remove any suggestion of unfairness. See *People v. Heider*, 231 Ill. 2d 1, 25 (2008); *People v. Dameron*, 196 Ill. 2d 156, 179 (2001). Accordingly, we are remanding this case to the chief judge of the circuit court for reassignment to a different judge for further proceedings.

¶ 30                                    III. Conclusion

¶ 31 For the foregoing reasons, we reverse the judgment of the circuit court of Perry County and remand for a new trial before a different judge.


¶ 32 Reversed and remanded.